

**NUMBER 13-14-00698-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF E.L., M.R., AND H.R., CHILDREN

**On appeal from the 156th District Court
of San Patricio County, Texas.**

# MEMORANDUM OPINION

**Before Justice Garza, Benavides and Perkes
Memorandum Opinion by Justice Garza**

Appellant, R.R., contends by seven issues that the evidence was insufficient to support the trial court's judgment involuntarily terminating his parental rights with respect to M.R. and H.R.[1]  We affirm.

---

[1] We refer to appellant and the children by their initials in accordance with rule of appellate procedure 9.8.  *See* TEX. R. APP. P. 9.8(b)(2) (providing that, in an appeal arising out of a case in which the termination of parental rights was at issue, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member").

## I. BACKGROUND

On February 28, 2014, appellee, the Texas Department of Family and Protective Services (the "Department"), filed a petition to terminate R.R.'s parental rights as to his biological children M.R. and H.R., who were born on October 24, 2011, and January 2, 2013, respectively.[2]  The petition alleged that R.R. committed "one or more" of the acts or omissions prohibited by Texas Family Code section 161.001(1) and that termination was in the children's best interest.  *See* TEX. FAM. CODE ANN. § 161.001 (West, Westlaw through 2013 3d C.S.).  The petition stated that the Department was seeking a non-emergency removal of the children "due to concerns of domestic violence between [the children's biological mother K.P.] and [R.R.], [K.P.]'s recent arrest for selling synthetic mari[h]uana, and [K.P.]'s refusal to comply with the department."

At trial on October 20, 2014, Mary Alice Martinez testified that she is a conservatorship worker with the Department and that she received a report in October 2013 alleging "drug use and domestic violence" between R.R. and K.P.  In February 2014, Martinez received a second report that K.P. "had been arrested for selling synthetic marihuana out of her car."  Martinez testified that "I believe one of the children was with her in the car."  Martinez stated that the Department then filed the instant petition for termination, and the children came into the conservatorship of the Department.

According to Martinez, the Department developed a family service plan for R.R. and K.P.  A "family group conference" was scheduled for both parents but R.R. did not attend.  Martinez testified:

---

[2] The petition also sought to terminate the parental rights of K.P., the biological mother of M.R. and H.R.; and J.L., the biological father of E.L., who is another child born to K.P.  The judgment on appeal terminated the parental rights of R.R. and J.L. but did not terminate the parental rights of K.P.  Neither K.P. nor J.L. are parties to this appeal.

> On that day I called [R.R.] because I had given him the wrong time for the group conference. And I spoke to him on the phone and he told me that he would not be able to make it because he didn't have a ride. I offered to pick him up and bring him to the office, but he said he was busy and couldn't make it. We discussed the services that would be put in place for him. And later I was unable to get hold—he was supposed to come in for a family visit, and we were going to review the case at that time—I mean the Family Plan of Service, but he had to cancel because he said he didn't have a ride. So the following day was the status hearing. He didn't show up to the status hearing, so I filed his Plan of Service without his signature.

Martinez stated that she sent the service plan to R.R. after he failed to appear at the status hearing. When asked whether R.R. complied with the service plan, Martinez testified: "He completed a drug assessment, and that was all that he did."[3] According to Martinez, the service plan required R.R. to participate in and complete parenting classes and a batterer's intervention program, but he failed to do either. The service plan also required him to participate in supervised family visits, but R.R. attended only one time, in March 2014 at the Department's office. Martinez stated that this was the last time R.R. saw the children.

Martinez stated that R.R. was ordered to provide to the Department "proof of housing and proof of working utilities," but R.R. "never told me where he was living, and I got the impression that he was living with friends, but I really don't know where he lives, and he never told me where he was living." She later stated: "I don't even know if he has a home. As far as I know he doesn't have a place of his own. I haven't been able to assess whether it's safe or not." Additionally, though R.R. was required to "comply with drug testing," he failed to appear for a drug test on August 15, 2014; and when he appeared three days later, he "refused to comply with the hair follicle test." Martinez

---

[3] With respect to the drug assessment, Martinez stated that R.R. completed the assessment on May 27, 2014; but when "the therapist came to his house to provide him with . . . substance abuse therapy," R.R. "never made himself available to the therapist, so she finally stopped coming around in July."

3

further stated that, though R.R. was ordered to stay in contact with her, she hasn't talked to him since July 19, 2014. She stated that, when R.R. did contact her, "[i]t was very difficult to have a conversation with [him] because if I said something that he didn't agree with or the conversation was not going the way he wanted, he would start cussing and yelling, and most of the time I would just end the conversation."

According to Martinez, R.R. participated in one supervised visit with the children in the beginning of March 2014. At the visit, R.R. brought the children shoes and toys. When asked by R.R.'s counsel whether the visitation went "pretty well," Martinez replied: "It was okay, yes." When asked whether the children were happy to see their father, Martinez replied: "They were okay." Martinez stated that, if R.R. wanted to have other visits, he merely had to call her and set it up; she denied that he would not have been able to set up additional visits because of his failure to comply with drug testing.

On cross-examination, Martinez conceded that K.P.'s mother advised the Department that she never witnessed any violence between R.R. and K.P. Martinez agreed that she was not aware of any "actual physical evidence" showing that R.R. committed family violence; instead, the evidence of family violence came from K.P.'s representations and from a protective order, issued in February of 2014, which required R.R. to stay away from K.P. and the children.[4] Martinez stated that the Department's plan for the children is to reunite them with their mother, K.P., though she conceded that there is evidence that K.P. used drugs while with the children.[5] She further conceded that,

---

[4] A copy of the protective order was later admitted into evidence.

[5] Martinez stated that the Department's plan is to reunify the children with K.P. because:

she's complied with all these services, and because the therapists have told me that they have seen a change in [her], and from when she first started her services to now, and I've seen a change in [her], what she's telling me and how she feels about herself, how she

4

though R.R. refused a hair follicle test, he was willing to provide a urine sample for drug testing.

Martinez acknowledged that, in July 2014, R.R. sent her a "text message about [her] sister that had just passed away" which she found greatly offensive. She later elaborated as follows:

> I was at my—that day we were having my sister's service, and I was between the church and cemetery when he called. I picked up the phone by mistake, and he started telling me that he wanted to relinquish his rights and give his rights to his sister, because she shouldn't be punished for him not doing what he needed to do and he had some mental health issues. And I said, *I am at my sister's funeral service, you need to call me on Monday.* And I hung up. He called me two more times; I didn't answer. Then he texted me and he said, *Well, "F" you and your dead sister.*

After that incident, Martinez decided that she would communicate with R.R. only through his attorney or by mail.

Martinez testified that termination of R.R.'s parental rights was in the best interest of the children for the following reasons:

> I don't know if [R.R.] is using drugs or not, but he has a history of drug use. And so that is a concern, because we were never able to drug test him and determine that he's not using drugs. The other major concern that I have is the safety of the children because of a domestic violence between them, because of the recent—he continues to threaten [K.P.] even up until last week with snapping her neck. And she doesn't allow him to see the children. So I think he's a very dangerous person, I think—I'm not a psychiatrist, but I feel like he's unstable.
>
> I've done this for a couple of years, and I don't think I've ever met anybody as angry and as dangerous or I've never felt that kind of danger before. I know he's very angry, and I don't think I've ever met anybody that has that kind of anger issues that he does. Like I said, he makes you feel uncomfortable and the comments that he makes. I do believe that he is a safety threat to the children, and especially to [K.P.].
>
> R.R. testified at trial that he has lived with his aunt and uncle in Taft, Texas, for

---

feels about the children, how she feels about the mistakes she made. And I believe her.

"about six months." He stated that he "ha[s] a two bedroom house for myself and the kids," but that since the children were removed, "[i]t's just really depressing to stay by myself" so "I like staying with my aunt and uncle." In early 2014, he "was advised" by Martinez that "there was a family whatever it was called" on or about March 26, 2014 and "[he] told her [he] wasn't able to attend." He later described that he was in a car accident on February 17 or 18, 2014, and that he was hospitalized for ten or eleven days after that. He received notice of a protective order hearing while he was in the hospital.

When asked whether Martinez explained "what services would be required of you," R.R. replied: "She explained certain things that might be required." When asked whether he received a copy of his service plan, he replied: "I might have." He agreed to do the service plan "because [he] wanted to see [his] kids"; although he stated "I really had no choice honestly." R.R. agreed that he "did not work [his] service plan except for the drug evaluation." In particular, he conceded he did not attend a batterer's intervention program, nor did he participate in parenting classes. Later, the following colloquy occurred:

| Q. [attorney ad litem] | So when I asked you about your service plan, and your response is, *I might have got a service plan*, you've been in court before, you knew there was a service plan in place, correct? |
|---|---|
| A. [R.R.] | I didn't agree with everything on that service plan from the get-go. You can ask [Martinez]. I spoke to the supervisor with C.P.S. that I didn't agree with that. I stated from the very beginning I wasn't going to go to batterer's intervention.[6] |

---

[6] R.R. later elaborated as follows:

I understood as far as maybe the anger thing, but as far as the batterer's, I don't understand why you would send someone to a class where they would need help in that. I might have anger issues, but I wouldn't hit women. Like why would you send someone that doesn't drink alcohol to an Alcoholics Anonymous meeting? They wouldn't know what you're

Q.      Excuse me. But you did get a service plan.

A.      I didn't understand it, I didn't understand it, put it that way. That's my final answer. I didn't understand the service plan.

Q.      Well, did you bother to ask [Martinez] about the service plan?

A.      She wasn't my first C.P.S. officer, I had like three of them. So I really was confused at the time. I even spoke to the supervisor about my service plan. I spoke with several of them, yes, ma'am, on my service plan.

Q.      Then you understood.

A.      I didn't understand, because I didn't agree with them. I didn't agree with them on the service plan. I told them I didn't agree with that batterer's intervention.

Q.      Do you understand not agreeing and not understanding are two separate things?

A.      I didn't understand it. I didn't understand why they wanted me to take something that I didn't feel I needed to take. Put it that way.

Q.      Did you know that the service plan had been adopted by the Court and made an order of the Court?

A.      I'm new to all this, ma'am, I'm not familiar with C.P.S. I don't know y'all's procedures. I don't know what kind of action you take as far as the kids. I'm really not familiar with it.[7]

---

talking about because they don't pertain to that.

So since I don't hit women, why would you send me—maybe I was a bad parent sometimes, but I didn't hit women. I wasn't going to agree to that. I felt if I took that class I was going to show guilt on my behalf that I hit women, that that title would stick with me the rest of my life. It's a bad title.

[7] R.R.'s lack of "familiarity" with court procedures was also evident from the following colloquy:

Q. [attorney ad litem]    And you were ordered to attend the batterer's intervention program, were you not?

A. [R.R.]    I didn't agree with that. That was issued by the Judge, that doesn't

7

R.R. stated that he served prison time for a drug offense "[m]any years ago." He stated: "I made a mistake when I was young, and I paid my debt to society. I'm what you call a rehabilitated felon." He had other drug charges filed against him as recently as 2011, but "[t]hat got thrown out the charge because they were false charges." He agreed that he has been off parole for the children's entire lives. He further stated that he had a second interview scheduled with a potential employer for a full-time, permanent job in "tool maintenance." He testified that he "would be able to pay child support" if his rights were not terminated. R.R. denied telling Martinez that he was going to relinquish his parental rights if his sister was awarded custody. He denied ever hitting K.P. or her mother; making threats to K.P.; or driving past K.P.'s house and telling her it wasn't a good idea to leave the front glass door open.

When R.R.'s counsel inquired about his refusal to undergo hair follicle drug tests, R.R. replied: "I didn't understand where they would get hair from. [Martinez has] known I've been bald for many, many years. I don't know, if they wanted to get it from my groin area I would have let them. I have never been through that." He further stated: "I believe

---

mean I was going to agree to that.

Q.    If it's issued by the Judge, isn't that an order?

A.    But you've got to understand my point of view.

Q.    Please don't interrupt me.

A.    You're interrupting me as well.

Q.    Let me finish my question. . . . I'll ask you one more time. Did you understand you were supposed to do a batterer's intervention program?

A.    I don't understand your question. I'm apparently not answering it right. I don't want to upset anyone in the courtroom. I don't want to say anything wrong.

Q.    Did you do a batterer's intervention program?

A.    No, ma'am.

8

that they asked for that because of the hair follicle you go back as far as you want, and I thought that they might try to find something in the far past to try to hurt me to use against me as far as this case." According to R.R., "I even told [Martinez] if they want to take a blood sample that's fine, but I couldn't submit a hair sample. I don't have any hair."

R.R. testified: "I believe [K.P.]'s a good mother, I believe I'm a good father, we're not compatible for each other, and it was affecting our children. I believe our time apart has shown us that, and I believe we should move forward with their lives as far as that goes." He agreed with K.P.'s counsel that he has had no contact with the children in six months, and that he has not paid any child support in the past six months.

K.P. testified that she is currently training to be employed at Best Western and lives with her mother. She testified that R.R. has punched her in the face on multiple occasions. According to K.P., in October 2013 R.R. punched her in the face while she was holding her one-year-old baby, causing the baby's head to hit the wall. She testified that R.R. once placed his hand over her eldest son's mouth to stop him from crying, causing "a rather large scratch and a little bruising"; and another time, R.R. "h[e]ld [K.P.] down in the bed with a knife to [her] neck" while she was holding her two-year-old son. K.P. stated that she and R.R. used drugs together after the children were born, but she denied using drugs while she was pregnant. She stated that she had a prescription for Xanax but "started abusing it after my kids got taken."

K.P. stated that the last time R.R. called or texted her was the previous week. She testified:

> He was telling me that he knew I was getting the children back, that he was glad whatever, and then he started asking me if I was going to let him see the children when I got them back. I said, *We'll let the Court decide when you get to see your kids.* And I guess that upset him. And he started telling

9

> me if I didn't let him see my two-year-old on his birthday on the 24th that I wasn't going to make it to court this Monday, that I had to remember that he knew where my dad lived, he knows where my brother lives, he knows where my family lives, my grandma he even said. He said—well, last time after court he had also said he was going to snap my neck, he didn't care where he saw me at, he was going to snap my neck.

She stated that she does not approve of R.R. having supervised visits with the children, because "I feel like there is a chance that if he were to see the kids that he could take off with them, and then I wouldn't see my kids anymore. That's what I'm afraid of." According to K.P., R.R. once "told me that we should be careful leaving the door open like that because it would be so much easier for him to snatch my kids."

K.P. testified that she completed all of the services required by the Department. According to K.P., in January or February 2014, R.R. took custody of H.R. "and he didn't give him back to me for two weeks I would say. Then he got into the car accident, left him with a friend, and that's how I got him back." K.P. stated she reconciled with R.R. in July 2014 but they were together "[n]ot even a month." She stated that M.R. is fearful of R.R. and "wants nothing to do with him."

On cross-examination, K.P. testified that she pleaded guilty to intent to distribute synthetic marihuana and received probation as part of a plea deal, but that she stopped using synthetic marihuana in March 2014. She affirmed the truth of the statements she made in an affidavit supporting her application for protective order, including statements that, during their relationship, R.R. "h[e]ld [her] down and strangle[d] [her] to the point of blacking out" on several occasions, and that he "call[ed] and text[ed] her repeatedly saying he was going to kill [her] and knew where [her] family lives." She stated that R.R. had never been arrested for assaulting her because the police "told me it was a civil matter." When asked why her mother would report that no violence had occurred between

10

her and R.R., K.P. replied:

> I'm sure [it] has to be for the same reasons I avoided C.P.S. for so long.  I was scared.  I have never been involved with C.P.S.  I was scared that my children would get taken, which eventually they did because of my non-compliance with them.  And I'm sure the same reason my mom said she hasn't seen anything.  My mom has seen several things.  But we had our own apartment for a short period of time where I was pregnant with our first son together where he would do a lot of these things, and he would do a lot of these things in Taft too.

When counsel asked K.P. what concerns she had regarding the safety of her children should R.R.'s parental rights not be terminated, she replied:  "That he might try to take them from me."  She believed R.R.'s parental rights should be terminated because:

> I just feel like he doesn't—he hasn't done anything to deserve to see my kids.  He hasn't complied with any of the services.  He hasn't done anything to show he's changed or to show that he's trying to change.  I feel like—I feel like it's taking a risk letting him be around my kids.  I'm afraid he may take off with them or that I'll never see them again if he gets hold of them.  And who knows where he would go or what he would do.

The trial court found by clear and convincing evidence that termination of R.R.'s parental rights was in the children's best interest and that R.R.:  (1) "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]"; (2) "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]"; (3) "failed to support the child[ren] in accordance with [his] ability during a period of one year ending within six months of the date of the filing of the petition"; (4) "voluntarily, and with knowledge of the pregnancy, abandoned the mother of the child[ren] beginning at a time during her pregnancy with the child[ren] and continuing through the birth, failed to provide adequate support or medical care for the mother during the period of abandonment before the birth of the child[ren], and remained apart from the child[ren] or failed to support the child[ren] since the birth";

11

(5) "contumaciously refused to submit to a reasonable and lawful order of a court under Subchapter D, Chapter 261, Texas Family Code"; and (6) "constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the [Department] or an authorized agency for not less than six months . . . ." *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (1)(E), (1)(F), (1)(H), (1)(I), (1)(N), (2). The trial court rendered judgment terminating R.R.'s parental rights, appointing K.P. possessory conservator and allowing her supervised visitation with the children, and appointing the Department as managing conservator.[8] This accelerated appeal followed. *See* TEX. R. APP. P. 28.4.[9]

## II. DISCUSSION

### A. Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.— Corpus Christi 2010, no pet.). "Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring). Accordingly, termination proceedings must be strictly scrutinized. *Id.* at 112. In such cases, due

---

[8] Prior to trial, R.R.'s counsel informed the trial court that he was advised that "the Department was not interested in proceeding with termination" as to his client, but that the attorney ad litem for the children "indicated she was interested in proceeding with termination." The Department did not put on any evidence at trial; instead, all of the witnesses that testified were called by the attorney ad litem. However, the Department stated in closing argument that it believed R.R.'s parental rights should be terminated.

[9] The Department submitted its appellate brief to this Court two days after it was due to be filed, *see* TEX. R. APP. P. 38.6, and contemporaneously moved for leave to file the brief. We hereby grant the motion and accept the brief.

12

process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2013 3d C.S.).

To terminate parental rights, the trier of fact must find that: (1) the parent committed an act prohibited by subsection 161.001(1) of the Texas Family Code; and (2) termination is in the best interest of the child. *Id.* § 161.001; *see In re J.L.*, 163 S.W.3d at 84.

R.R. does not specify whether he is challenging the legal sufficiency or factual sufficiency of the evidence. In reviewing the legal sufficiency of evidence supporting termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85; *In re L.J.N.*, 329 S.W.3d at 671. We must assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so and must disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and

13

convincing evidence.").

When reviewing the factual sufficiency of the evidence supporting termination, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## B.   Findings Under Subsection 161.001(1)

By his sixth issue on appeal, R.R. argues that the evidence was insufficient to support findings that: (1) he "constructively abandoned the child[ren] who ha[ve] been in the permanent or temporary managing conservatorship of the [Department] or an authorized agency for not less than six months"; (2) that the Department "has made reasonable efforts to return the child[ren] to the parent"; and (3) that he "has not regularly visited or maintained significant contact with the child[ren]." *See* TEX. FAM. CODE ANN. § 161.001(1)(N)(i), (ii).[10]

The evidence showed that R.R. visited with the children once while they were in the Department's custody, in March 2014. However, he admitted at trial that he had not had any contact with the children within the past six months; and Martinez testified that,

---

[10] Under part (N) of subsection 161.001(1), it must also be shown that "the parent has demonstrated an inability to provide the child with a safe environment." TEX. FAM. CODE ANN. § 161.001(1)(N)(iii) (West, Westlaw through 2013 3d C.S.). However, R.R. does not argue on appeal that the evidence was insufficient to support that element. Accordingly, we do not address the issue. *See* TEX. R. APP. P. 47.1.

14

despite R.R.'s failure to comply with drug testing, he could have had additional visits with the children if he had merely called her to make the request. In any event, one visit in eight months does not constitute "regular" visitation or "significant" contact with the children. *See id.* § 161.001(N)(ii). Accordingly, the evidence supported the trial court's findings by clear and convincing evidence that R.R. "constructively abandoned the child[ren] who ha[ve] been in the permanent or temporary managing conservatorship of the [Department] or an authorized agency for not less than six months" and that he "has not regularly visited or maintained significant contact with the child[ren]." *Id.*

R.R. further contends that the Department failed to "make reasonable efforts to return the child[ren]" to him because (1) Martinez "intentionally chose not to communicate with" him and (2) the Department "insist[ed] that [his] conduct was more dangerous or harmful to the children than the conduct of [K.P.]." Martinez testified that R.R. was "very difficult to have a conversation with" and that "he would start cussing and yelling" if "the conversation was not going the way he wanted." She further testified that R.R. called her while she was at her sister's funeral service and that, when she told him to call back the following Monday, R.R. sent her a text message stating "Well, 'F' you and your dead sister." Martinez found the text greatly offensive, and she decided to thereafter communicate with R.R. only through his attorney or by mail. We do not believe that Martinez acted unreasonably in making this decision. Moreover, the evidence was undisputed that the Department established service plans for both R.R. and K.P. with the objective of returning the children to them, and that K.P. complied with each of the service plan's requirements but R.R. did not. Although R.R. equivocated about whether he was provided with a copy of the service plan and whether he understood its terms, Martinez

testified clearly that she sent a copy of the plan to him. The trial court could have reasonably chosen to believe Martinez's testimony and disbelieve that of R.R. *See In re J.F.C.*, 96 S.W.3d at 266; *In re L.J.N.*, 329 S.W.3d at 671. We conclude that the evidence was sufficient to allow the trial court to form a "firm belief or conviction" that the Department "made reasonable efforts to return the child[ren]" to R.R. *See id.* §§ 101.007, 161.011(1)(N)(iii).[11]

R.R.'s first issue is overruled.[12]

## C.    Best Interest of the Children

By his seventh issue, R.R. argues that the evidence was insufficient to support the finding that termination of his parental rights is in the children's best interest.

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131 (West, Westlaw through 2013 3d C.S.); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In *Holley v. Adams*, the Texas Supreme Court set forth several factors that courts consider in determining whether termination is in the child's best interest. *See* 544 S.W.2d 367, 372 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the

---

[11] We do not believe, as R.R. suggests, that evidence of K.P.'s misconduct has any bearing on whether *he* constructively abandoned the children or whether *the Department* made reasonable efforts to return the children to him. *See* TEX. FAM. CODE ANN. § 161.001(1)(N).

[12] Because of our disposition of this issue, we do not address R.R.'s first through fifth issues, in which he argues that the evidence was insufficient to support findings under parts (D), (E), (F), (H), and (I) of family code subsection 161.001(1). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."); *see also* TEX. R. APP. P. 47.1.

16

parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Id.* The party seeking termination is not required to prove all nine factors; in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 25, 27. Moreover, evidence that proves one or more statutory grounds for termination may constitute evidence illustrating that termination is in a child's best interest. *Id.* at 28.

As to the first factor, we note that, at the time of trial, M.R. was less than three years old and H.R. was less than two years old. Although K.P. testified that M.R. "wants nothing to do with [R.R.]," we find that both children are too young to have credibly stated their desires. *See In re R.S.D.*, 446 S.W.3d 816, 818, 820 (Tex. App.—San Antonio 2014, no pet.) (finding that the child, who was "almost four years old" at the time of trial, was "too young to have stated his desires"). Consideration of this factor therefore weighs neither in favor of nor against termination.

As to the second factor, there was no evidence as to any emotional or physical needs of the children, either now or in the future. *See Holley*, 544 S.W.2d at 372. Consideration of this factor also weighs neither in favor of nor against termination.

Consideration of the third *Holley* factor weighs in favor of termination. A protective order containing a finding of family violence by R.R. was part of the evidence considered by the trial court. Additionally, K.P. testified that R.R. had been physically violent with her in the past on multiple occasions. In particular, K.P. stated that R.R. once punched her in the face while she was holding a baby, causing the baby's head to hit the wall; and that

17

he once "h[e]ld [her] down in the bed with a knife to [her] neck" while she was holding her two-year-old son. K.P. further testified that R.R. continues to verbally threaten her. Martinez testified: "I've done this for a couple of years, and I don't think I've ever met anybody as angry and as dangerous or I've never felt that kind of danger before." To the extent R.R. disputed any of this testimony, the trial court was free to disbelieve it. *See In re J.F.C.*, 96 S.W.3d at 266; *In re L.J.N.*, 329 S.W.3d at 671.

We observe that there was minimal evidence that R.R. engaged in violence that was specifically directed at the children as opposed to K.P.[13] Nevertheless, evidence that R.R. was violent toward K.P. in the past supports an inference that he presents a danger of violence in the future. *See In re R.S.D.*, 446 S.W.3d at 820 (noting that "a trier of fact may measure a parent's future conduct by her past conduct" to determine whether termination of parental rights is in the child's best interest). This inference is further supported by evidence that R.R.'s violence, though primarily directed at K.P., took place in the presence of the children and occasionally caused the children to suffer injury. It is also supported by R.R.'s admission that he failed to participate in a batterer's intervention class as the trial court had ordered.

As to the fourth factor, regarding parenting abilities, R.R. conceded that he failed to participate in court-ordered parenting classes. Martinez testified that, out of all the requirements set forth in the service plan, R.R. completed only a "drug assessment." Although there was no evidence that R.R. behaved inappropriately when he did visit the children, it is apparent from R.R.'s failure to comply with the service plan that he was not

---

[13] The only such evidence in the record was K.P.'s testimony that R.R. once put his hand over her son's mouth to stop him from crying, causing a "rather large scratch" and "a little bruising."

18

motivated or interested in learning to improve his parenting skills. *See Wilson v. State*, 116 S.W.3d 923, 930 (Tex. App.—Dallas 2003, no pet.) (noting in best interest analysis that appellant "was not motivated to learn how to improve" her parenting skills); *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.) (noting in best interest analysis that appellant did not have the ability to "motivate herself to seek out available resources"). Consideration of this factor weighs slightly in favor of termination.

Other than testimony establishing that R.R. was required by the service plan to participate and complete parenting classes and a batterer's intervention class, there was no evidence regarding programs available to assist R.R. in parenting. Consideration of the fifth *Holley* factor therefore weighs neither in favor nor against termination.

As to the sixth factor—the plans for the child by the parties seeking custody—R.R. testified that he "ha[s] a two bedroom house for myself and the kids" but that he currently does not stay at the house. He further testified that he believes "the kids should be with their mother." Martinez stated that the Department plans to eventually reunite the children with K.P. There was no other evidence adduced as to the "plans for the child[ren]" of K.P., R.R., or the Department. Consideration of this factor weighs neither in favor nor against termination. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012) (holding that appellant's "failure to articulate a plan for the children, beyond allowing the children to return to the mother," is "legally insufficient to weigh in favor of termination").

With regard to the seventh *Holley* factor—the stability of the home or proposed placement—Martinez testified that R.R. "never told me where he was living," thereby preventing her from assessing whether R.R.'s home is safe for the children. Martinez testified that she has "seen a change" in K.P. since the Department became involved in

19

terms of "how she feels about herself, how she feels about her children, how she feels about the mistakes she made." But she conceded that there was evidence that K.P. had, in the past, used drugs while with the children. There was no testimony regarding the stability or safety of K.P.'s home or the home in which the children currently live. Consideration of this factor weighs slightly in favor of termination.

As to the eighth factor—acts or omissions which may indicate that the parent-child relationship is not proper—as noted, K.P. testified that R.R. was violent with her in the past, and that this violence affected the children. It was undisputed that R.R. failed to comply with the court-ordered service plan and that he failed to visit with the children in the six months prior to trial. Consideration of this factor weighs slightly in favor of termination.

Finally, as to the ninth *Holley* factor, regarding any excuses for acts and omissions committed by the parent, R.R. appeared to contend that he was hindered in completing the required services because of his car accident in February 2014. However, this does not explain why he failed to participate in any family visits since March 2014. R.R. also claimed that he "didn't understand the service plan"; but it is apparent from his testimony that he knew the service plan contained certain requirements but simply disagreed that they were appropriate. In any event, the trial court was free to disbelieve his testimony. *See In re J.F.C.*, 96 S.W.3d at 266; *In re L.J.N.*, 329 S.W.3d at 671. Consideration of this factor weighs in favor of termination.

Considering all the factors, and in light of the entire record, we find that a reasonable trier of fact could have formed a "firm belief or conviction" that termination of R.R.'s parental rights was in the best interest of M.R. and H.R. *See* TEX. FAM. CODE ANN.

20

§ 101.007. We note that the direct evidence supporting the best interest finding was not overwhelming.[14] K.P. testified repeatedly that she wanted R.R.'s parental rights to be terminated because she was afraid that he may try to "take off with them" and she would never see them again. However, if the trial court denied termination, it would still have had the broad discretion to require that any access R.R. may have to the children be supervised, *see, e.g., In re N.L.D.*, 412 S.W.3d 810, 824 (Tex. App.—Texarkana 2013, no pet.), which would have presumably minimized the risk of abduction. K.P.'s testimony that she was afraid R.R. would "take off with" the children, therefore, does not indicate that termination of his parental rights was in the best interest of the children. Moreover, there was no evidence presented as to the condition of the children in their current placement.

K.P. also testified that she does not believe R.R. has "done anything to deserve to see my kids." But termination of parental rights may not be based on a finding that the parent is "undeserving" of parental rights. Instead, the inquiry focuses on the children— termination must be in *their* best interest, regardless of what the parent may or may not "deserve." *See id.* § 161.001(2). And consideration of the children's best interest must take into account any potentially negative repercussions arising from termination—such as the inability of the custodial parent to obtain child support—along with any potential positive effects.

Nevertheless, there was ample circumstantial evidence supporting the best interest finding. K.P. testified that R.R. was violent toward her on multiple occasions in

---

[14] This could perhaps explain why, according to representations made by R.R.'s counsel, the Department initially did not intend to seek termination of R.R.'s parental rights.

the past, and that the violence affected the children. Martinez testified, from her own experience, that R.R. is "very angry" and "dangerous." There was scant evidence that R.R. directed violence specifically toward the children, nor was there any other evidence that R.R. was a bad parent. But the record is replete with evidence showing that R.R. was a disinterested, absent parent. He made little effort to comply with the court-ordered service plan and was uncooperative, at best, with the caseworker. He took advantage of the opportunity to visit the children only once in the eight months since the Department filed its petition. He refused to submit to a hair follicle drug test.[15] Additionally, Martinez opined that K.P. had complied with her service plan and had changed such that she no longer presented a danger to the children.

We conclude, having reviewed the evidence in the light most favorable to the finding as well as in a neutral light, that the evidence was both legally and factually sufficient to support the trial court's best interest finding. R.R.'s seventh issue is overruled.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
9th day of April, 2015.

---

[15] R.R. volunteered to undergo a urine analysis in lieu of the hair follicle test, but there was no evidence that the Department was equipped to administer a urine analysis. The trial court could have reasonably inferred that R.R.'s refusal to submit to the hair follicle test indicated that he was using drugs. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) ("The jury could reasonably infer that appellant's failure to complete the scheduled screenings indicated she was avoiding testing because she was using drugs.").